Ruffin, C. J.
 

 The bill was filed in August, 1843, and states: That Sarah Freeman died in 1839, and that the defendant, Newlin, in August, 1839, propounded for probate, a script as her will, which the plaintiff and Richard Freeman, (her surviving husband, and a defendant in this suit,) caveated; but that, after much litigation in different Courts, it was finally established as a will of her personal estate: That the personal estate consisted of money and
 
 *33
 
 bonds
 
 to
 
 a large amount, and thirty-fire or forty slaves; and that, by the will, the whole personal estate was bequeathed to the defendant Newlin, as sole legatee, and he was appointed the executor : That Newlin was a member of the Quaker society, and it was well known to the testatrix that he would not hold slaves, and was opposed, on religious principles, to slavery; and that she designed, for that reason, to will the slaves to him, in order that they might be kept by him in a state of qualified slavery ; and that those views and purposes were communicated b3r her to Newlin, and that he undertook to carry them out: That, although the bequests in the will to Newlin are absolute in their terms, yet they were, in fact, made, not for the benefit of Newlin, but for the benefit of the slaves, and upon an unlawful, secret trust, that he should be, apparently, their owner, but should suffer them to enjoy the privileges of freedom, contrary to the policy of the law, and apply the other profits of the estate to their use and benefit. It states, further, that the will was made by virtue of a power in marriage articles between Freeman and his wife, which excluded him from her property, and limited it to her next of kin, incase she made no disposition: and that the plaintiffs are her next of kin. The prayer is, that Newlin may discover the trusts on which the bequests were made to him, that they may be declared void, and a trust declared to result to the plaintiffs, and for an account and distribution.
 

 The answer of Newlin admits the marriage articles to the effect set forth in the bill, and of the contents .of the will, of the tenor set forth, the caveat, and its final decision in 1842 ; that the personal estate consisted of twenty-nine slaves, and cash and debts to the amount of six or eight thousand dollars. It admits, or states, that the defendant had frequent conversations with Mrs. Freeman, upon the subject of her slaves, and she uniformly expressed a desire
 
 *34
 
 to have them emancipated, and consulted him as to the best mode of effecting her purpose: “ That, when about to make her will, she was fully apprised, that the negroes could not remain in North Carolina as free persons: That she was, also, fully aware, that she might express a trust in her will for the benefit of the slaves, by which, according to law, they might be sent out of this State to any other State or country, by which they might enjoy their freedom; or, if she preferred it, that the said trust might be created, without being expressed in the will, by confiding her purpose to a friend, which would be as effectual in law as if it were expressed in the will: That the testatrix preferred to confide to the defendant her earnest wish, without expressing it in her will; and she did, accordingly, request him to take the necessary steps to carry her wishes into effect: That, although she seemed to prefer Liberia to any other place of destination for them, yet she left to the defendant’s discretion the place, and manner of transporting the slaves to some other place than North Carolina; and that so zealous was she on the subject, that about a year before her death, she instructed the defendant, who was her general agent in the management of her money, to collect a sufficient sum and make preparations for then sending the slaves out of this State; but¿ not long afterwards, she recalled the instructions, because, she said, some of them must stay to wait on her, as she was old and infirm, and she was not willing to send some without all: That the defendant agreed to accept the trust, and did so with the determined purpose of executing it to the best of his ability : and that in that purpose he had, at no time, been shaken, although he had kept it to himself, and had never communicated it to any person, until he did so to his counsel, while engaged in drawing his answer: and that, but for the pertinacity of the plaintiffs in prosecuting suit after suit against him, in
 
 *35
 
 relation to the property, he would, long since, have executed the trust, by sending, the said slaves out of the State: That he had, at no time, any understanding with Sarah Freeman, either express or implied, to commit any infraction of the laws of this State : and that he does not know nor believe, that she entertained any purpose to evade the law, by continuing the slaves in a state of qualified slavery, and that he never entertained or conceived any such purpose.” The answer further states, “that the other property was given to this defendant by the testatrix, in part for the purpose of carrying'into execution the trusts hereinbe-fore stated, (which must needs be expensive, not only in procuring the transportation of the negroes, but in making some provision for them) and, in part, to make ample compensation to this defendant for the trouble and expenso to which he must be subjected, in carrying into effect the wishes of the testatrix.” The answer concludes by stating, that “ this defendant hath thus fully stated the facts within his knowledge, and declared the trust imposed on him by the testatrix, and his acceptance thereof; and he saith, that it is his purpose to execute the same according to the laws of the State, and in pursuance of this purpose, he submits to be directed in the manner of carrying out the purposes of the testatrix by this Court, if it be deemed material to do so.”
 

 The cause was heard in this Court at December Term, 1849, as reported, 6 Ire, Eq. 380, when the will is set forth and a declaration was then made, that the slaves were bequeathed by the testatrix to the defendant, Newlin, upon a secret trust for their emancipation, and that it was intended by the testatrix and the defendant, that the said slaves should not be kept in this State but be lawfully emancipated, transported to Liberia, or some free State and there enjoy their freedom: and that such intention and bequest was
 
 *36
 
 not contrary to, but sustained by, the law; and further, that the testatrix confided in the defendant, Newli'n, and was by him induced to believe, that he would in a reasonable time take the necessary and lawful steps to carry her said intention into effect, and that he in fact assumed the said trust, and thereby became bound to execute the same ; and for as much as the defendant submitted in his answer to carry the said trust into effect under the directions of the Court according to lavt', it was further declared, that he ought to emancipate them by filing a petition for that purpose in the Superior Court of Law, and giving bonds pursuant to the statute in such case provided, and that one year thereafter, would be reasonably sufficient for effecting that object. All other equities were reserved until the expiration of that period, and then either party was at liberty to move for further directions.
 

 At December Term, 1850, on th'e motion of the plaintiffs the Clerk was directed to enquire what proceedings had been taken by the defendant for emancipating- the slaves. The report states, that the defendant had not filed a petition in the Superior Court, nor given bonds as mentioned in the decretal order, but that he had emancipated the slaves by removing them in September, 1850, to Logan county in the State
 
 of
 
 Ohio, and there duly executing a deed of emancipation and having the same proved and recorded. And the Clerk annexed to the report the examination of the defendant on interrogatories, in which he stated'; that he was advised by eminent counsel, that this .mode of emancipation was equally effectual and within the trust, as that prescribed in the Statute, and that it was preferable, as he believed, because he had reasons to apprehend, that, if the emancipation took place in this State by giving bond, some of the plaintiffs or other persons might detain some of the negroes in this State by secret means.
 
 *37
 
 or seduce them back, after they had been once carried away, so as thereby to forfeit his bond and subject thein again to slavery : that he had no other reasons for proceeding in this mode, and had no purpose to evade the law of the State or intend any contempt of the Court: that the negroes were all willing to go to Ohio, and bo emancipated, and live there : and that it was not contrary to the law' of Ohio for them to do so, but consistent therewith, as he believed on the information of many persons in that State, and the advice of some counsel there.
 

 The plaintiffs then filed a petition to rehear the order of December, 1849, and brought it on to be argued, with a motion, founded on the report, to declare, that the defendant ought not to have further time to obtain an order for emancipation in this State, and that, by reason of his not complying with the former order as to the" mode of emancipation, the defendant was a trustee for the next of kin, and bound to distribute the slaves and other personal estate among them.
 

 It the opinion of the Court were not against the plaintiffs on other points, it might be well worthy of consideration, whether, supposing the trusts for emancipation and providing for the slaves to be unlawful and void, the defendant, Newlin, would not be entitled, beneficially, to the 'whole property, according to the terms of the trust set out in the answer, and thus the next of kin be excluded
 
 ?
 
 He says, the bequests were made to him, not only upon the trust to have the negroes set free, and defray the expenses of their removal and settlement, but as to any surplus over and above answering these purposes, for himself, as an ample compensation to him for his agency in the transaction. Now, as Lord Eldox observed, in
 
 King
 
 v
 
 Dennison,
 
 1 Ves. and Beam. 260, there seems to be a plain distinction between a disposition of the legal estate to one for the mere
 
 *38
 
 purpose of discharging.particular trusts, and nothing more, and one in which there is an intention that the beneficial interest shall be taken with reference to that part not given on the particular trusts : in the former, if the trusts do not, in their execution, exhaust the whole, so much of the ben-•ficial interest as is • not exhausted, belongs to him : in the latter, if the whole be not exhausted by the particular purpose, the surplus goes to the devisee. The reason is, that, in one case, the whole gift was in trust, without any bene.fit being intended to the donee of the legal estate : whereas, in the other, the devisee takes the surplus, because it was intended to be given to him. In that case, it was so held on a devise, and much more would it be so in reference to personalty, since next of kin are less favored than the heir, and especially, as there is here an express residuary gift to the defendant, Newlin, of the whole personal property in the largest -terms. It is true, that the residue -itself was gi-ven partly in trust, and that may, possibly, ■make-a difference, -though -no reason for it is perceived, as no certain part or share of it was in trust, but the legatee was to keep beneficially, whatever should not be needed for the other particular purposes. But the Court does not determine the point, since it was not discussed at the bar,' and it is thought more useful to place the decision on the more general and important questions involved in it.
 

 The question raised on the rehearing is, that the Court erred in declaring the nature of the trust intended by the testatrix, namely, that it was, that the slaves should be lawfully emancipated and transported to some other free country or State: whereas it was, that they should not be emancipated here, but be sent away, in evasion of law, and be emancipated abroad without giving bonds, that they should mot return into this State: which latter trust is supposed -to be against law and void, and then that a trust results -to the plaintiffs. And the question made by the plaintiff's
 
 *39
 
 motion, founded on the report, is that, supposing the decía-ration of the trust was, in point of fact, correct, yet, as the defendant did not proceed, in conformity with the order, in, the execution of it, he should not now have liberty, to do so, but. be made- immediately answerable for the slaves or their value, as: being yet in a state of servitude, or put beyondi the- reach, of the plaintiffs by the defendant, contrary to his duty and; the law.
 

 It is not certain that either of those points can be raised on the bill as it is framed. It alleges no trust for emancipation here or elsewhere,, and consequently does not impeach any such trust as. being in any respect illegal. On the contrary iit charges,, that the bequests were on trust, that the defendant should keep the negroes, not for his benefit, but for theirs, in a state of qualified slavery. It would, seem, that case is answered when it is found, that there was no such trust as. that charged. But, assuming the bill to be sufficient, and, indeed, that' it contained express charges of such trusts and purposes as are now imputed to the testatrix, it seems to the Court, that those charges are not established, but that the declaration of the trust in the decretal order was the only one, that could have been judicially made. It is to be ohserved, that there are no means of arriving at the trusts on which these gifts were, made, but the answer itself. On the face of the will no trust appears, but the donations are out and out to the defendant. But he admits certain trusts and says they were the true and only trusts. Can others be imputed ? upon what ground, and to what extent ? ' Supposing evidence to be admissible in such a case to contradict the will and the answer, there is none, of any sort, to the fact, that the trust was different from that set forth in the answer, or that there was any trust at all. It may be conjectured from the religious principles of this defendant, and other collateral
 
 *40
 
 circumstances, that there was some sort of trust for emancipation somewhere or holding the negroes as
 
 quasi
 
 free here. But there is, undoubtedly, nothing on which any particular trust can be established, but that admitted in the answer. Why should not that be credited*!1 It would have been as easy and as honest in the defendant to deny a trust altogether, and assert a beneficial legacy in himself, which would have been conclusive,
 
 Ralston
 
 v
 
 Telfair,
 
 2 Dev. Eq. 255, as to have denied the true trust, and set up a false one. Indeed, the temptation to the former was' much the stronger, as he had a personal interest in that, and none in the latter. Now, the answer states explictly that the intention was to carry the negroes out of the State to Liberia or some free State, and, without specifying any particular mode of eflecting the emancipation, as contemplated by either of the parties, it avers that there was no. intention “ to commit an infraction of the laws of this State,” in any respect. It is said, however, that the secrecy of the trust and the defendant’s subsequent acts in the mode of executing it, prove the contrary, and that it was the purpose from the beginning not to obtain the emancipation according to our law, but to carry the slaves elsewhere for emancipation. But those do not seem fair and just conclusions of facts, if the terms of the will and answer could be controlled by such matter
 
 dehors.
 
 It is not easy to see, why the testatrix did not express the trust in her will. But it is hard to hold, that the creation of it in confidence between herself and the defendant, for a charity of this kind, proves a-purpose to evade and defraud the law of the country. She might not have wished it to be known during her life, or the parties might have distrusted their ability to express it in the will so as to be legal and effectual, while her wishes might be perfectly understood by her friend, to whom she -was willing to confide the office of
 
 *41
 
 carrying them out, trusting therefor to the sanctions of his conscience, rather than to the coercion of the law.
 

 But, whatever might be her motive, the answer is dis-¡ tinet, that she intended no violation of the law of this State: and
 
 the
 
 validity of the trust depends upon her intentions, and not upon the subsequent acts of the defendant, whether in performance or in breach of the trusts, as meant by her. If it be said, she had no intention that the defendant should give the bonds required by our law, so as to obtain emancipation here, it may be yielded, without prejudice to the correctness of the decretal declaration. For, we suppose the testatrix had no particular intention as to the'mode of emancipation; and, indeed, it is possible, that she was ignorant how it might be effected, here or elsewhere. Her purposes were, merely, lhat her slaves should be emancipated, and that they should be effectually emancipated according to law, whatever that might be, including their removal from this State, at all events. In those purposes, nothing immoral or unlawful is seeu, although the testatrix did not go on to say, in so many words, that the defendant should procure the emancipation, by pursuing the steps pointed out by the Statute, passed in this State in the year 1830 ; for, if the will had expressed the trust, that the ne-groes should be free, and the executor should carry them to a particular country, and settle them there, there would be nothing illegal in that, even if it were illegal to direct the emancipation abroad; because, nothing appearing to the contrary in the will, it would be entitled to the favorable construction, of meaning an emancipation consistently with the law: and, therefore, if the giving bonds and procuring a license here to emancipate, be, in law, essential to the emancipation, it would be inferred that, according to the trust, it was so intended. A trust of the kind now before us, when ascertained, is of precisely the same obligation,
 
 *42
 
 and entitled and subject to the same interpretation, as if it were expressed in the will — which principle, indeed, is the foundation of this bill. As for, then, as the intention of the testatrix can be collected, the emancipation of the slaves was to be legally effected: for the direction, that they should be carried out of this State, was nothing more than the law itself required, and the only question, with reference to the point under consideration is, whether her direction was, that they should be carried away without, or after emancipation here. Now, upon that, there is the general principle, just mentioned, that a general direction is to be taken as intended, to be consistent with the law, and there is, also, the positive assertion in the answer, that in this case, the fact was according to that presumption, which shows that the declaration was right, that the testatrix intended that the slaves should not be kept in this State, but be lawfully emancipated and transferred to some free State, to enjoy their freedom there. The subsequent acts of the defendant cannot vary the tact as to the intentions of the testatrix, nor his obligation to observe them. Up to the decretal order, the defendant certainly acted in conformity with the trust admitted by him, and, indeed, the answer contained a submission to execute the trust under the direction- oí the Court, as being a part oí his duty under the trust: thus confirming the presumption as to the purposes of the testatrix, arising from the other considerations. The conduct of the defendant, since that time, does not show the nature of the trust to have been different originally, nor change the rights of the negroes, nor create any in the next of kin of the testatrix; for, if a lawful emancipation was intended by the testatrix, and that which the defendant has effected be unlawful, then, it is true, the defendant has been guilty of a breach of trust, but that cannot destroy the rights of the
 
 cestui que
 
 trust, nor vest the property in the next of kin-,
 
 *43
 
 from whom the testatrix took it away, by a lawful disposition. Admitting, therefore, that the defendant may have exposed himself to the penalty of a contempt, by not proceeding under the decree, according to his submission, yet that does not affect the question between him and the plaintiff. — Nay, admitting that the emancipation were not, as yet, legally éffected, nevertheiesss, supposing a lawful trust to have been intended, as declared and now held, the plaintiffs are cut off at all events. For, there can be no doubtj that in some way the defendant, having accepted the trust, may be compelled to execute it in behalf of the ne-groes, as
 
 cestuis que
 
 trust; and, therefore, the plaintiffs cannot maintain this suit. The Court will not allow a lawful trust to fail, by the laches of the trustee, or for the want of one. In
 
 Hope
 
 v
 
 Johnson,
 
 2 Yerg. 123, a testator in Tennessee directed his land there to be sold, and the proceeds laid out iu land in Indiana, and the right vested in his slaves, naming them, to whom he gave their freedom, and the settling of them in Indiana, under the direction of his executors ; and a bill was filed by the heirs and next of kin, to restrain the executors from selling iho land and removing the slaves, on the grounds that the provisions for emancipation and the purchase of land ior the slaves, were void. But the bill was dismissed, and Judge Haywood, in delivering the opinion of the Court, said, that when the mind of the testator to emancipate was made known in his will, it was the duty of the executor to make use of all such legal means as should be effectual for the completion of his purpose. Indeed, it is a settled rule, that a trustee, having accepted, cannot withdraw from the duty, but must go on to perform the trust; and it is said, the rule has no exception.
 
 Worth
 
 v
 
 McAden,
 
 1 Dev. and Bat. Eq. 199, Lewen on Trusts, 260. It may be asked, then, why this bill was not dismissed on the hearing'? There is no hesi
 
 *44
 
 tation in saying, that would have been the proper course: especially as the opinion was then distinctly intimated, that the rights of the next of kin were extinguished. But it was thought — incorrectly, probably, — that the Court might act on the submission of the defendant to proceed in the emancipation, under the direction of the Court, and an inclination was manifestly felt, that it should be done in conformity to the particular provisions of our law. For that reason such directions were given; and, of course, the rights of the next of kin, if any, were saved until it should be seen, whether the delendaut pursued those directions, or failed to do so. It was, rather irregularly, attempting to do by an order in this Court, what would, properly, have been the subject ot a suit by the negroes, or on their behalf, against the defendant, to enforce tfie trust. But that cannot alter the rights of these parties between themselves; and, as the trust, found is held to be legally valid, the plaintiffs have no interest, and the bill must be dismissed.
 

 The case has hitherto been considered as if the testatrix had no particular intention, that the slaves should be carried immediately out of the State for emancipation abroad, as that, it is apprehended, must be judicially understood to be the fact. Consequently, enough has been said for the decision of the present suit. But as the question must often arise in other cases, and has been very fully argued in this, and it is important that the state of the law on such a point should be known, it is thought to be proper to state the opinion formed by the court, on the supposition, that the trust really was, as contended on the part of the plaintiffs, that the defendant should carry the slaves out of this State, to be emancipated, without applying for their emancipation here. On that point the Court holds the law to be also against the plaintiffs: because that trust is not expressly forbidden by the law of this State, nor is
 
 *45
 
 i t against the policy of the law, nor the public interest, but is lawful and valid. The point is not a new one in this State, nor in our sister States, in which slavery exists and laws also regulating (he mode of emancipation, similar to our own. In
 
 Cameron
 
 v.
 
 Commissioners, of Raleigh,
 
 1 Ired. Eq. 436, the slaves were sent by the executors to Africa without previous emancipation, and the Court held that gifts to them in the will were good and decreed their payment to them as free persons. In the opinion of the Court it is stated, that “ our law and policy alike forbid the manumission of slaves to reside amongst us, but they never did forbid the removal of them to a free country, in order to their residence there as free people and as one evidence, that such was the policy of the law, reference was had to the Act of 1830, as promoting and encouraging their emancipation, so that they be removed and kept withr out the State. The whole subject has been before the Court a few years previous in the case of
 
 White
 
 v.
 
 White,
 
 1 Dev. & Bat. 260, and the opinion delivered was not hastily, but deliberately formed, and the whole Court concurred in it. The point came up again directly in
 
 Cox
 
 v.
 
 Williams
 
 4, Ired. Eq. 15, when the same judgment was pronounced, and the reasons more fully stated. Upon that occasion also, the Court, after a change in one of the Judges, was unanimous, both as to the argument and the conclusion. Then the policy of our law, as collected from the only legitimate source — our Legislature — was said to be opposed to the residence of freed negroes in this State, but it had never been to restrain the owner of the slaves from removing them from this State, either for servitude or freedom elsewhere: and it was further said, that in no case, in which it had been held that the direction for emancipation was void, from
 
 Haywood
 
 v.
 
 Craven
 
 down, had the deed or will directed, that the emancipation should
 
 *46
 
 take effect abroad. That has been said to be inaccurate, ■and the case of
 
 Pendleton
 
 v.
 
 Blount,
 
 1 Dev. & Bat. Eq. 491, is supposed to show it to be so. But it is only apparently so, from the imperfect statement of the will, and is really another example of the correctness of what was said in
 
 Cox
 
 v.
 
 Williams.
 
 For, the will there directed the ne-groes to be hired here, and their hires to constitute a fund in the hands of the executor for their benefit, and furthermore that this should be kept up perpetually by the executor and’his executor or. administrator, unless “ at
 
 anytime ■hereafter
 
 any-of the negroes'Or any of
 
 thevr increase
 
 should desire to go to Africa or a free State,” and in that case the -executor was to give such slave his or her proportion of the fund. It was, therefore, a case of indefinite
 
 quasi
 
 freedom -here for existing and future generations of the slaves, and was plainly an evasion of our law, against the emanci►pation of persons who reside here. It is perfectly true, then, that no trust has been declared void, but when the pur- ■ pose was apparent, that the .negroes could remain here : in which case, as we do not adopt the rule
 
 cy pres,
 
 and could hot order them to be carrried abroad, the disposition must -necessarily fail. In all those, in which the direction was to send them out of the State to live as tree persons, the '-disposition has been .supported. Against that it is argued, that it evades the act of 1830, inasmuch as the public loses the security required by the act against the return of the slaves, and, moreover, that it is contrary to the enactment, ■ that no slave shall be set free, but according to the provi- . sions of the act. But the argument is answered in this : : that it’ supposes the power of emancipation is a privilege granted by the statute, and therefore exists only
 
 sub modo.
 
 ■ Whereas the true principle is, that the power of the owner to give, and the capacity of the slave to receive, freedom, exist in nature, and therefore may be used in every case and every way, except those in which it is forbidden by
 
 *47
 
 law. The statute, therefore, effectually bars emancipation here except in the manner pointed out in it, and one; who wishes to gain for his slave the liberty to stay here for a period after emancipation, must conform to the statute.— But, neither in its terms, nor in its spirit, does it prohibit a
 
 tona fide
 
 removal of slaves to another State, for the sake of their freedom. Its title is, “ An act to
 
 regulate
 
 the emancipation of slaves
 
 in this State
 
 and it has no clause or word affecting any person or thing extra-territorial, ex- . ceptingonly, that it requires a slave, emancipated here, to remove and stay out of the State under the heavy penalty, of being sold as a slave. Now it may be — it is not for us to say how — that a slave, carried abroad under the will of one of our citizens for emancipation, would, upon returning, fall into the category of slaves emancipated here.— But that has nothing to do with the rights of the owner or next of kin to such slaves, which would invest them with, a beneficial interest in one class of them, more than in the other: and, whether they might be sold or not on return* ing, is not material to the enquiry, as to the validity of the emancipation actually effected abroad with the
 
 Iona fide
 
 intention of a residence abroad, and while such residence continues. To such a case the statute has no application. For, it is to be observed, that it puts emancipation, by the owner, and by the owner’s executor under the direction of the will, exactly upon the same footing, except as to the executoi’’s liability to creditors. Now no one has ever supposed, that an owner of a slave was prohibited by our" law from carrying his slave,' in his life time, to Africa or to Ohio, for the purpose of granting him freedom: and if he, who has a slave in his own right, can do so, and his act be valid, so can one acting
 
 in auter droit
 
 in execution of a-trust. The statute does not make the act of either void:-
 
 *48
 
 and such must be the plain provision of a statute in order to have that effect.
 

 When this point was again brought into question in this case, after the former decisions of the Court, it became the duty of the Court to look to the adjudications of our sister States, similarly situated with ourselves, for aid in sustaining our judgments, or discovering our error. The research has been made, and been successful in finding several adjudications accordant with ours, and no one to the contrary. The first found is that of
 
 Frazier
 
 v
 
 Frazier,
 
 which which was decided in South Carolina in 1835; and the case was this : In that State there was a Statute, *hat no slave should be emancipated, but by Act of the Legislature. A testator directed his slaves to be set free, and provided a fund to enable them to go to St. Domingo to be colonised. The next of kin filed a bill against the executor, claiming the negroes and lund. It was dismissed, the Court holding these propositions: That, notwithstanding the extensive terms used in the Act, the case was not within it, because an owner might remove his slaves from the State for any purpose he pleased, and he might therefore authorise his executor to do so, unless prohibited by Statute : and because the evil, against which the act was directed, was the increase of free negroes in the State, and the removal of slaves belonging to her citizens and their emancipation out of her borders was no injury to her. Hence the Court concluded, that the right of the owner to authorise his executor to carry his slaves out of the State, could only be restricted by a Statute, expressly making such a testamentary disposition void, 2 Hill’s ch. R, 305. In 1840, the question came before the Court of errors and appeals of Mississippi upon appeal from the Chancellor in the case of
 
 Ross
 
 v
 
 Vertrees,
 
 and
 
 Ross
 
 v
 
 Duncan,
 
 1 Freeman’s ch. R. 587, and 5 Howard’s Rep. 305. Ross directed by ex
 
 *49
 
 press provision in his will, that certain of his slaves should be sent to Africa, under the superintendence of the American Colonization Society, to reside there as free persons, and he gave parts of his estate as provision for them. Then Mrs. Reed, a daughter of Ross, by her will gave all her estates, real and personal, to the defendants, including her interest in her father’s estate, if his will should be held invalid, upon a secret trust, (set forth in a letter written by her to the defendants contemporaneously with the execution of the will.) that the defendants should carry all her slaves to Liberia, there to remain free. The next of kin filed bills against the legatees and executors claiming the estate, upon the ground, that the dispositions were contrary to the law and policy of Mississippi and void, and that a trust resulted. The Statute of Mississippi was, “that it shall not be lawful for any person, being the owner of slaves, to emancipate them unless by his or her last will and testament, duly attested, &c., and unless also it be proved' that such slaves have performed some meritorious act for the benefit of such owner, or some distinguished service for the benefit of the State : and such last will shall not have validity until sanctioned by the Legislature, nor until the owner shall have complied with the conditions specified in' such act.” Yet the trusts of both wills were, after most elaborate arguments, upheld, and both bills dismissed, notwithstanding there had been no legislative sanction of either will. The grounds taken by both Courts were precisely those, shortly stated in
 
 Cox
 
 v Williams: that the prohibition of emancipation was a regulation of internal police, and the Statute was to be construed in reference to that object, and therefore confined to a local operation within
 
 the
 
 State, or to such acts done out of the State as were intended to have their effect in it: that the right to' manumit a slave is perfect at common law, and that the
 
 *50
 
 Statute did not take it away, but only qualified it, when exercised within the State : and that Mississippi had no concern with the manumission of slaves in other States, and did not assume a police jurisdiction in them, but only within her own borders; and, finally, that, therefore, the emancipation directed by the testators, though not made by virtue of the Statute of Mississippi, was »ot contrary to it. The case of
 
 Haywood
 
 v
 
 Craven,
 
 was much pressed on the Court in those cases, and it was properly put upon the ground, that the will directed the emancipation to be by the laws of this State, and therefore- that the negroes were to remain here, and in that way it was distinguished, from a trust to carry slaves to Liberia, there to remain free. The question again came up in the same Court in 1846, in a different form. The executors of Ross refused to deliver the slaves to the Colonization Society, or to sell the estate given for the negroes, on the ground, that the trusts were in fraud of the Statute on the subject of manumission and against public policy, and therefore void. Upon the bill of the Colonization Society against the executors, the trusts were again held to be lawful and valid, and the slaves were decreed to be delivered to the Society, and the bequests for the benefit of the slaves declared void, as they had by the will an inchoate right of freedom and capacity to take, which became complete on their removal out of that State ;
 
 Wade v American Colonization Society,
 
 7 Smedes and Marsh 663. It seems likewise from a note that has been met with of a case in Georgia, that the same doctrine is there held as law;
 
 Jordan
 
 v
 
 Bradley,
 
 Dudley’s Rep. 170. But, as the book, containing the report of the case, is not to be had here, no reliance is placed on it. The other cases cited are so perfectly accordant with our own, both in the reasoning and conclusions, that the Court may, with
 
 *51
 
 the more confidence, reaffirm their correctness, and place our present decision on their authority.
 

 It is not doubted, that it is perfectly competent to the Legislature to qualify the right of manumission, whether
 
 inter vivos,
 
 or by will, by any regulations that may seem meet to that body, or even to make void any direction in a will of her citizens, for the removal of her slaves from the State, for the purpose of emancipation elsewhere. But mere legislative regulations, for emancipation within the State, cannot operate on trusts elsewhere : because they are neither within the words nor the policy of such enactments. It requires an express enactment, or plain provision, in avoidance of such a testamentary disposition, before a Court can impose a restraint on a citizen, by depriving him of the natural right of sending his slave, where he can do us no hurt, that he may live and be free there.
 

 The result is, that the emancipation of the slaves is deemed effectual and proper, and the dispositions in their favor, and that of the defendant, Newlin, held valid : and, therefore, the bill must be dismissed with costs.
 

 Per Curiam. Decree accordingly.